UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

K.E., by and through her parents,
K.E. and T.E.,

        Plaintiff/Counterdefendant,

v.                                  Civil No. 09-2433 (JNE/FLN)
                                        ORDER

Independent School District No. 15,
St. Francis, Minnesota,

        Defendant/Counterclaimant.

---

Margaret O'Sullivan Kane, Esq., Kane Education Law, LLC, appeared on brief for
Plaintiff/Counterdefendant K.E.

Nancy E. Blumstein, Esq., and Christian R. Shafer, Esq., Ratwik, Roszak & Maloney, P.A.,
appeared on brief for Defendant/Counterclaimant Independent School District No. 15, St.
Francis, Minnesota.

---

        K.E., a student within Independent School District No. 15, St. Francis, Minnesota

(District), filed this action by and through her parents seeking attorney fees and costs after an

Administrative Law Judge (ALJ) found that the District had denied her a free appropriate public

education (FAPE) in violation of the Individuals with Disabilities Education Act (IDEA), 20

U.S.C. §§ 1400-1482 (2006).  The District denied K.E.'s entitlement to attorney fees and costs in

its Answer and counterclaimed for judgment on the administrative record.  The case is before the

Court on K.E.'s motion for attorney fees and costs and the parties' cross-motions for judgment

on the administrative record.  For the reasons set forth below, the Court grants the District's

motion for judgment on the administrative record, denies K.E.'s motion for judgment on the

administrative record, and denies K.E.'s motion for attorney fees and costs.

# I.    BACKGROUND

## A.    Kindergarten and first grade

K.E. has attended St. Francis Elementary School (School) since kindergarten.  In April 2003, when K.E. was five, she was evaluated by Dr. Jonathan Miller, a pediatric neuropsychologist at Children's Hospital in Minneapolis, Minnesota.[1]  K.E.'s mother (Parent) reported to Miller that K.E. began experiencing severe mood swings that cycled rapidly when she was two-and-a-half years old.  Parent also reported that K.E.'s biological mother had a history of bipolar disorder and that K.E.'s biological father's history was significant for depression and bipolar disorder.[2]  According to Miller's evaluation, K.E. had difficulty falling asleep and staying asleep, was easily angered and frustrated, experienced a great deal of anxiety and difficulty during transitions, and heard voices in her head.

Miller's evaluation described the results of previous evaluations of K.E, including a University of Minnesota evaluation that diagnosed her with disruptive behavior disorder in 2001.[3]  In addition, according to Miller's evaluation, the University of Minnesota had previously diagnosed K.E. with attention deficit hyperactivity disorder (ADHD) and fetal alcohol syndrome.  Miller's evaluation indicated that a psychiatrist who first saw K.E. in December 2001 had diagnosed her with bipolar disorder but that Dr. Gary Gronstedt, her then-current treating psychiatrist, was in the process of ruling out several disorders, including bipolar disorder.

---

[1]    K.E.'s claims cover the time period between December 16, 2006 (two years before K.E. filed her due process complaint) and February 13, 2009 (the date K.E. filed her amended due process complaint).  Accordingly, events occurring before December 16, 2006, are described for background purposes only.

[2]    K.E. was adopted by her paternal aunt and uncle by marriage when she was eighteen months old.

[3]    None of the evaluations described in Miller's report are part of the record.

Instead, Gronstedt was treating K.E. for ADHD and oppositional defiant disorder.  By the time of Miller's evaluation, psychiatrists had treated K.E. with an extensive list of medications, including Lithium, Depakote, and Tegretol, which are mood stabilizers; Prozac and Zyprexa, which are antidepressants; Respiradone, which is an antipsychotic; and Tenex, Dexadrine, and Clonidine, which are attention-modifying medications.  At the time of Miller's evaluation, K.E. was taking Concerta, Risperidone, and Clonidine.

Miller's evaluation indicated K.E.'s overall IQ was 82, which he concluded "should not be used as a reflection of her overall level of functioning."  According to Miller, K.E. was dependent on existing organization, meaning, and context and had difficulty with free recall, novel or complicated tasks, and processing abstract or unstructured information.  In addition, K.E.'s hyperactivity affected her ability to accumulate and process information.  Miller concluded that K.E.'s off-task behavior was likely related to her cognitive challenges, language processing difficulties, poor task persistence, and easy frustration, which could cause "much variability" in her day-to-day functioning.  Miller also noted that K.E. was impaired with respect to behavioral self-regulation and demonstrated aggressive, oppositional, and impulsive behaviors that interfered with her learning and social relationships.  He diagnosed K.E. with a cognitive disorder (not otherwise specified) and a disruptive behavior disorder (not otherwise specified).  Based on K.E.'s history, Miller also diagnosed her with a mood disorder (not otherwise specified) and fetal alcohol effects (neurobehavioral disorder).

Miller made a number of recommendations directed to her caregivers and educators.  With respect to K.E.'s education, Miller recommended delivery of verbal material at a moderate pace with frequent breaks; a reduced workload in class and for homework; multi-modal presentation of new information, preferably in a visual format; placing novel material in a

familiar context and the provision of recognition cues; and encouraging her to work slowly and carefully. Miller noted that off-task behavior might occur when K.E. was challenged by language or visual demands of a task. To prevent such behavior, he recommended giving K.E. opportunities to withdraw, interspersing frequent rest opportunities and low-demand tasks with high-demand tasks, and providing K.E. with additional sources of active time. Finally, Miller recommended that K.E. and her family continue to work with Gronstedt to find a medication that would decrease her hyperactivity, which would involve keeping detailed records of K.E.'s behavior.[4] Some time before April 28, 2005, the District received a copy of Miller's evaluation, which was kept by the School nurse in K.E.'s health file.

**B.      Second grade**

The District evaluated K.E. for special education services in April 2005. The evaluation stated that K.E. had a diagnosis of "Mood Disorder and ADHD" and that her parents reported a diagnosis of bipolar disorder. According to the evaluation, K.E. was taking several prescription medications and saw a psychiatrist monthly and a therapist every two weeks. Her parents also reported that K.E. had difficulty following directions, remembering directions, keeping her belongings organized, and using planning skills. The results of testing conducted by the School psychologist indicated an IQ score of 78, significant strength in the area of processing speed, significant struggles with language-based learning, and below-average skills at processing

---

[4]      A significant portion of the ALJ's conclusions and remedy are based on the finding that Miller recommended that K.E.'s educators "closely monitor" her performance. Miller made no such recommendation. Rather, his report contained an "impression" that K.E.'s "behavioral difficulties can cause much variability in her day to day functioning" and a recommendation that: "[K.E.] and her family should continue to work with Dr. Gronstedt to find a medication that will be effective in decreasing [K.E.]'s hyperactivity. This likely entails keeping detailed records of [K.E.]'s behavior over time to provide Dr. Gronstedt with valuable information about the success and specific failures of particular medications." In short, the recommendation for close monitoring was directed to K.E.'s family, not her educators.

information spatially and holding and manipulating stored information. The evaluation indicated that K.E.'s reading and classroom teachers made several accommodations for her, including repeating directions, giving full credit for late assignments, shortening assignments and exams, providing visual prompts, assisting with her planner and organization, and providing preferential seating. K.E.'s classroom teacher noted "marked differences" in K.E.'s behavior depending on whether she had taken her medication. The evaluation also indicated that K.E. displayed appropriate behavior at school but had significant issues with executive functioning.[5]

The evaluation recognized that K.E.'s ability to complete educational tasks within routine timelines was limited by her difficulties with attending, time management, organization, and following directions. However, because a current DSM-IV diagnosis was not on file, K.E. did not qualify for special education services. *See* Minn. R. 3525.1335 (2004) (requiring written and signed documentation of a medical diagnosis by a licensed physician, including DSM-IV criteria, dated within the previous 12 months for initial evaluation of student). The team agreed to revisit K.E.'s eligibility once Parent obtained a current DSM-IV diagnosis. An updated evaluation dated October 18, 2005, indicated that Parent provided a DSM-IV diagnosis of ADHD dated September 22, 2005, from Dr. John Wermager.[6] Wermager did not diagnose K.E. with bipolar disorder. After the District received Wermager's diagnosis, K.E. qualified for special education services under the category of other health disabilities (OHD).

The District developed an individualized education program (IEP) for K.E. in October 2005. The IEP established goals for K.E. directed to reading, writing, spelling, independent

---

[5]     Executive functioning encompasses the ability to control emotions and behavior and the ability to initiate, plan, organize, and sustain future-oriented problem solving in working memory.

[6]     Wermager's diagnosis is not part of the record.

work skills, and small-group social interaction skills.  One of the IEP's adaptations for K.E. was placement in a resource setting for reading and writing.  Adaptations while in the "inclusive classroom setting" included repeating directions, providing directions one-on-one, providing visual checklists (words or pictures) for task completion, presenting information several times in a variety of formats, assisting with organization, providing preferential seating, providing opportunities to redo assignments and exams, and placing K.E. in an alternative work setting when necessary.  Parent approved the IEP.

On December 16, 2005, Parent notified the District that K.E. had been hospitalized for mental health issues.  A note referencing K.E's hospitalization was kept in the School nurse's files.

March and June 2006 progress reports indicated that K.E. met some of her reading and spelling goals and made progress on her other reading and spelling goals.  She met all of her social skills goals.  She met some of her independent work skills goals, and made progress on the others.

C.      **Third grade**

On September 26, 2006, the School received a medical order for the administration of Risperdal to K.E. by School personnel for the treatment of bipolar disorder.  In October 2006, K.E.'s IEP team developed her third-grade IEP.  The IEP included new goals for reading and spelling.  The goals for independent work skills changed only slightly, and the social skills goals remained focused on a small-group setting with the additional goal of initiating appropriate conversations with her peers in a socially acceptable manner at recess and lunch.  Goals for math skills were added.  Other than stating that K.E. would also be in a resource setting for math, K.E.'s adaptations remained unchanged.  Parent approved the IEP.

Dr. Richard Ziegler, a professor of pediatrics and neurology at the University of Minnesota, evaluated K.E. in October 2006.  His evaluation summary, dated January 26, 2007, indicated that Parent was concerned about dyslexia and executive functioning, but was "not interested in assessing for the presence of bipolar disorder" because a doctor in Connecticut had recently formally diagnosed K.E. with that disorder.[7]  Ziegler's evaluation also noted the previous diagnoses of ADHD and fetal alcohol effects.  When Ziegler first evaluated K.E. on October 17, 2006, her prescription medications included Adderall XR, Risperdal, Trazadone, and Clonidine.  The Adderall XR was discontinued, and melatonin was added before Ziegler's second evaluation on October 25, 2006.  The medical history section of Ziegler's evaluation noted that K.E. had been hospitalized at Abbott Northwestern for a psychiatric evaluation and medication adjustment.  According to Ziegler's evaluation, K.E. had participated in therapy for behavioral concerns but therapy had been discontinued in July 2006.  Ziegler's evaluation also noted that K.E. engaged in "rage" behavior at home and had a history of auditory hallucinations.

Katherine Baciak, K.E.'s special education teacher for third grade and the beginning of fourth grade, completed an information form as part of Ziegler's evaluation.  Baciak indicated that K.E. had moderate delays in reading, math, fluency, reasoning, and written language skills.  Baciak further indicated that K.E. had minor difficulties with receptive and expressive language and that she had difficulty with motivation and attention, poor organizational skills, and difficulty attending to tasks and staying focused and organized.  Baciak stated that K.E. had made steady gains in reading and that her social skills had improved as a result of working with the School social worker.

---

[7]     Parent testified that she did not obtain a report from the Connecticut doctor because it was too expensive.

Ziegler's cognitive testing indicated that K.E.'s processing speed abilities, working memory, and perceptual reasoning were below average, while her verbal problem-solving abilities were average. Tests of K.E.'s executive functioning indicated "significant difficulty with attention," as well as with inhibiting behavior, controlling emotions, getting started with tasks, retaining information to complete a task, planning and organizing tasks, and organizing materials needed for tasks. Her reading and spelling abilities were below average, her math skills were low average, and her overall written language skills were impaired. Similarly, her overall language skills were impaired, including her ability to attend to and follow complex verbal directions. Results from an assessment completed by Parent indicated that K.E. had significant difficulties with hyperactivity, aggression, depression, and atypicality. K.E.'s test results, however, did not indicate "significant depressive symptoms consistent with diagnosis of a mood disorder," and her scores with respect to anxiety were within the average range. Ziegler concluded that the test results and Parent's responses supported a diagnosis of a nonspecific episodic mood disorder.

Ziegler determined that K.E.'s symptoms were consistent with ADHD. With respect to Parent's concerns about dyslexia, Ziegler noted K.E.'s significant language impairment and cautioned that K.E.'s academic progress must be viewed in the context of her "complex psychiatric concerns," stating:

> It is our impression that [K.E.]'s general slowing or plateauing of academic skills are likely the result of her difficulty managing her behavior and following the flow of information in the classroom as a result of her psychiatric issues including mood disorder and ADHD. It should also be noted that her medication treatment can negatively affect the efficient processing of language based and visually based information.

Ziegler recommended that K.E.'s IEP team meet to consider the provision of speech and language services, additional small group instructional time or paraprofessional support within

the classroom, and additional services in the area of written language. He concluded by inviting the School to contact him to discuss individual services and accommodations that might be most appropriate for K.E.

Logs of K.E.'s behavior taken between February 5, 2007, and February 8, 2007, indicated that K.E. was disruptive during class and lost her planner, behavior logs, and homework. The logs noted that K.E. remained on task and accomplished tasks when an educational assistant (EA) worked with her.[8] A progress report dated March 9, 2007, indicated that K.E. had met one of her reading goals and made progress on some, but not all, of her other reading goals. K.E. had regressed on her spelling goals, but had made progress on her math goals. She was struggling with her independent work skills goals when not in a small group setting or working one-on-one with a teacher and had not made progress with her social skills outside of small group settings.

Parent provided a copy of Ziegler's report to the IEP team, which met to discuss the report on March 21, 2007.[9] A speech and language clinician participated in the IEP team meeting to address Ziegler's recommendation of speech and language services. At the due process hearing, Baciak testified that the IEP team considered all of Ziegler's recommendations, that some of his recommendations were already incorporated into K.E.'s IEP, and that the team determined that K.E. was not demonstrating a need for speech and language services at that time. The IEP team did change K.E.'s adaptations to include access to EA support within the

---

[8] The parties referred to a paraprofessional and an EA interchangeably; the Court does the same.

[9] The record does not reflect when Parent provided Ziegler's evaluation to the School.

classroom or the resource room and sensory breaks as needed.[10]  Parent participated in the IEP

team meeting over the phone and approved the revised IEP.

A progress report dated June 7, 2007, indicated that K.E. had achieved several of her

reading goals, regressed on some of her spelling goals (although the progress report noted that

the difficulty of the words had increased), and progressed on some of her writing goals.  She

continued to struggle with her independent work skills and her social skills in large group and

unsupervised settings, and had made some progress on her math objectives.

## D.      Fourth grade

K.E. began fourth grade in the fall of 2007.  Some time before October 2007, K.E.

stopped taking her prescription medications.  Instead, K.E. was taking what Colleen Flaten, the

licensed school nurse at the School, described as non-prescription "natural medications or herbal

remedies" during the fourth grade.  Michelle Fahland, K.E.'s special education teacher for

second grade and most of fourth grade, testified that K.E. was more impulsive and that her

behavior was more inconsistent in fourth grade compared to second grade.  She thought K.E.'s

behavior may have deteriorated because of the change in medication.

The IEP developed for K.E.'s fourth-grade year had increasingly difficult goals for

reading, spelling, and math skills.  K.E.'s independent work skills and social skills goals did not

change from the previous year.  Her adaptations also remained unchanged.  Parent was present at

the IEP team meeting and consented to the IEP.

A progress report dated March 7, 2008, indicated that K.E. was making progress in math,

reading, and spelling, although she continued to have difficulty with independently writing

---

[10]      Baciak testified that K.E. had access to an EA for the remainder of third grade in the
classroom and during recess and lunch, but Parent testified that K.E. did not have access to an
EA in third grade.

sentences and paragraphs. She continued to struggle with capitalization and punctuation, as well as with paragraph organization and sentence structure. She did not make progress with most of her independent work skills goals or with her social skills in large group and unsupervised settings. The March 2008 progress report noted that a reevaluation of K.E. was scheduled for spring 2008 and that K.E.'s independent work skills would be addressed during the reevaluation meeting.

Fahland and Ray Bonine, K.E.'s classroom teacher for fourth grade, testified that K.E.'s inappropriate behavior increased that year and that her behavior was interfering with her education.[11] Parent testified that fourth grade was a difficult year for K.E. Her impression was that K.E. made very little progress on her academic, organizational, and task completion skills. K.E. testified that fourth grade was hard for her because it was challenging and she was unable to function at school.

### E.    2008 reevaluation

K.E.'s reevaluation was completed on May 5, 2008. The health history referenced K.E.'s diagnoses of bipolar disorder and hospitalization at Abbott Northwestern and indicated that Parent had agreed to inform School health staff of any changes in K.E.'s mental health or medications. The family interview section noted Parent's reported diagnoses of bipolar and mood disorders and ADHD. In addition, Parent reported that K.E. did not bring work home, required assistance organizing her belongings, had difficulty paying attention to instructions and

---

[11]    For example, on April 10, 2008, K.E. was suspended because she told another student that K.E. needed to bring a knife to school. The notice of suspension stated that a meeting would be held to discuss K.E.'s IEP and her recent behaviors. On April 30, 2008, K.E. was written up in a transportation discipline report for threatening and intimidating other students, including threats to beat up, punch, and kill them. The report stated that K.E. had "received many warnings" and had an assigned seat. On May 8, 2008, K.E. was the subject of another transportation discipline report for pushing, shoving, and slapping another student.

completing tasks, did not seem to consider cause and effect, demonstrated impulsive behavior, and had difficulty getting along with her peers. She also had a hard time falling asleep and staying asleep and often seemed fatigued.

K.E.'s academic performance was described as low average compared to her peers. K.E.'s art, music, computer, physical education (PE), classroom, and special education teachers reported that K.E. had difficulty sustaining attention, following directions, and remaining quiet. They also reported that K.E. had difficulty keeping her belongings organized, using independent work time productively, and with reading comprehension. All teachers reported giving K.E. frequent redirection and preferential seating as adaptations. In addition, K.E. was permitted to redo assignments and retake tests for a better grade and received full credit for late assignments. The teachers frequently checked to see if K.E. understood the material. K.E.'s art teacher accepted alternate responses, and Bonine used visual prompts, examples as cues and models, and matching exercises broken into smaller sections when working with K.E. Bonine also provided assistance with K.E.'s planner/log and organization and read tests aloud to K.E. In addition, K.E. was participating in a behavior incentive program and was supervised by an EA during her bus rides from one building to another and during recess and lunch.

The reevaluation included a sensory profile, which indicated that K.E. had difficulty processing sensory input and regulating her physical, emotional, and behavioral responses to sensory stimuli in the educational setting. The reevaluation explicitly noted that K.E.'s "ability to benefit fully from the educational environment appears to be impacted by decreased processing of sensory information." Parent also noted that K.E. struggled with information processing.

The team conducted a functional behavioral assessment (FBA) as part of the reevaluation. The functional skills portion of the reevaluation, which was completed by three teachers and Parent, indicated that K.E. had significant difficulties in all areas of executive functioning. The FBA identified two behaviors as requiring change: blurting out during class and unstructured times and negative interactions with peers across all school settings. According to the FBA, K.E. blurted out two to three times an hour and interacted negatively with peers three to four times a week. The FBA noted that K.E.'s behaviors were tracked on a daily log and that she could earn computer time before lunch and at the end of the day if she behaved appropriately. According to the FBA, K.E. responded positively to the reward system.

As a result of the reevaluation, K.E.'s disability was changed from OHD to emotional or behavioral disorders (EBD) with a secondary disability of OHD. The stated reason for the change was K.E.'s diagnoses of personality disorder and probable bipolar disorder.

## F.    Fifth grade

K.E.'s IEP team revised her IEP in May 2008 after the reevaluation was completed. Fahland testified that a behavior intervention plan (BIP) was included in the May 2008 IEP because K.E.'s disruptive behaviors had increased in the spring of 2008. The BIP was intended to reduce verbal disruptions, negative verbal interactions with peers, and physical aggression towards peers. The BIP identified the following as triggers of inappropriate behavior: the teacher giving instructions to the class, independent work time in the classroom, and unstructured time (lunch, recess, and transitions between classes). A daily behavior log/incentive system; reminders to raise her hand, wait her turn, and keep her hands to herself;

and the "1, 2, 3 Magic" technique[12] were described as strategies intended to decrease the likelihood of such behaviors. In addition, the use of preferential seating, preferential line placement during transitions, checks by staff to see if K.E. understood instructions, and the opportunity to work in a setting with fewer distractions were identified as environmental strategies intended to decrease instances of inappropriate behavior. Physically aggressive behavior would result in prompts to walk away or go to a quiet area. If the physical aggression did not cease, "containment procedures" were to be used on K.E. by staff certified in their use.

The May 2008 IEP set goals for K.E. in reading and spelling that were substantially the same as those in the October 2007 IEP. K.E.'s math goals were advanced, but her independent work skills goals were unchanged. Her social skills goals focused on K.E.'s behavior in large groups and limited supervision settings. The following adaptations were added: access to sensory tools, supervision by an EA at lunch and recess, reading aloud of tests, and opportunities to redo assignments and retake tests for an improved grade. The adaptations incorporated the behavior log and BIP. Fifteen minutes per week of occupational therapy was added to the IEP.

Parent attended the IEP team meeting and reported that Dr. Sencan Unal, a psychiatric psychologist and medical doctor at the Mayo Clinic, had diagnosed K.E. with bipolar disorder with psychotic traits the day before the team meeting. Parent stated that she would provide a copy of the diagnosis to the District and approved the IEP. The record does not reflect if and when Parent provided a copy of Unal's diagnosis to the District. Flaten testified that it was her

_____

[12]     According to the 1, 2, 3 Magic technique, staff would first redirect K.E. to a positive behavior if she engaged in disruptive behavior. Then, the staff would show K.E. a visual indicating that she was at the first of three stages. If the disruptive behavior continued, the staff would show K.E. a visual indicating that she was at the second of the three stages. Continued disruption would result in a visual indicating that K.E. was at the third of three stages. If the disruptive behavior continued, the staff would prompt K.E. to take a break for five minutes. If calm after the break, K.E. would return to the previous environment; if not, she would continue to take five-minute breaks until she became calm.

responsibility to obtain medical confirmation, if Flaten wanted it, but she did not obtain Unal's diagnosis. She later explained that Parent had been "very forthcoming" in providing health information and that she trusted Parent to provide her with medical evaluations.

Unal's clinical notes indicated that she diagnosed K.E. with bipolar disorder, type 1, mixed episode, severe, with psychotic symptoms; ADHD; oppositional defiant disorder; possible learning disabilities; chronic disabling mental illness; low self-esteem; and poor interpersonal skills. At the time of K.E.'s first visit to Unal, she was taking nutritional supplements and 1 mg of Clonidine at bedtime. Unal prescribed Trileptal for K.E.

A June 2008 progress report indicated that K.E. had regressed with respect to certain reading and spelling goals and somewhat progressed with respect to others. She made no progress or regressed with respect to writing. She continued to struggle with her independent work skills goals, although the progress report noted that sitting on a therapy ball during class increased her focus and attention span. Her social skills in large group and unsupervised settings remained unchanged.

K.E. received final grades of a D in health, a B in math, a B in reading, a D+ in science, a D- in social studies, a B in spelling, and a C in writing. Standardized testing indicated some growth in the areas of math, reading, and language usage, although the growth was less than typical for her grade level.

Unal saw K.E. again in June and July 2008. K.E.'s condition appeared to be improving, and Unal started her on Seroquel while continuing the Trileptal. Although nothing in Unal's clinical notes indicated that she recommended an alternative school placement for K.E, Parent e-mailed Unal on August 28, 2008, stating that she had found an alternative school that was close

to K.E.'s home. Parent asked Unal to fax a letter to Peg Hill, who is the special education coordinator for the District.

On September 3, 2008, Hill informed Jacqueline Stein, the director of special services for the District, that she had received a call from Parent inquiring about day treatment for K.E. because it was recommended by the Mayo Clinic. Parent left a message for Stein on the same day. The next day, Stein left a message for Parent asking her to return Stein's call. Stein also asked K.E.'s fifth-grade special education teacher, Pamela Johnson, to set up an IEP team meeting to discuss Parent's request.

On September 18, 2008, Stein spoke with Parent about day treatment options for K.E. Stein explained that an IEP team meeting was necessary to discuss changing K.E.'s placement. Stein offered to schedule an IEP team meeting, referred Parent to Isanti County's children's mental health services, and asked the School's social worker to provide Parent with contact information for day treatment programs. On September 23, 2008, Parent indicated in an e-mail to Unal that she did not think an IEP meeting would help because the District did not "have a clue" how to deal with K.E. She asked Unal to send a letter to the School recommending day treatment and to re-fax a request for the administration of medication by the School directly to her because the School had not received it.[13]

Unal's clinical notes indicated that she spoke with "school representatives," including K.E.'s special education teacher, regarding K.E.'s emotional and cognitive disabilities on September 25, 2008. The identities of the participants in this conversation are unclear. Unal first testified that she spoke with Stein and another person, but Stein testified that she did not speak with Unal until December 2008. During cross-examination, Unal testified that she did not

_____

[13]     Unal's records do not indicate that any such request was faxed to the District.

remember the name of the person with whom she spoke and that it was possible that she spoke with Hill rather than Stein.  However, Unal also testified that she spoke with someone who worked with K.E. on a daily basis, but neither Hill nor Stein did so.  Unal's clinical notes indicated that she agreed to provide a letter to the District and request accommodations based on K.E.'s needs.  The clinical notes further indicated that Unal asked Parent to "inform the school on a very frequent basis" about K.E.'s mood fluctuations.

On September 27, 2008, Unal left a message for Stein regarding possible day treatment for K.E.  The message indicated that Unal would fax a letter to Stein or the School.  Stein left a message with Unal asking her to return Stein's call.  A note dated September 30, 2008, indicates that the District did not have a signed release for K.E.'s medical information at that time.

Unal sent a letter regarding K.E. to Hill.  Although the letter was dated September 26, 2008, the record reflects that it was not received by the District until "[s]ome time in October 2008" when Parent provided it to Johnson.  Unal referenced K.E.'s diagnoses of bipolar disorder and ADHD and described K.E.'s mental illness as "severe psychopathology [that] presents with mood and thought disturbances."  Unal described K.E.'s symptoms and stressed that bipolar disorder was an "episodic illness which impact[ed] [K.E.'s] cognitive functioning, emotional regulation and behavioral control."

Unal asserted in the September 26 letter that K.E. could "hardly read" and did not have "appropriate skills in mathematics."  Unal provided recommendations for the upcoming school year, including a "close alliance" between the School and K.E.'s parents, close observation and guidance during lunch and recess, very close contact between K.E. and her teachers and paraprofessionals, "assistance to narrow down the homework assignment and accurately translate them to her notebook," giving academic instructions in small steps, extra transition time between

classes, alternative communication methods with her teachers, adjustments to her homework, additional time to complete assignments and homework, and close supervision to monitor her reaction to academic demands and make immediate interventions to avoid mood episodes. Unal also stated that she would be in touch with School staff "on a frequent basis" to assist. She did not recommend an alternate placement for K.E.

The record indicates that K.E. was disciplined on several occasions for making fun of other children in September and October 2008. In addition, K.E. indicated on one occasion that she wanted to hurt herself, prompting a conference between Parent and School personnel about how to deal with such statements.

On September 30, 2008, the District sent Parent a notice of an IEP team meeting scheduled for October 10, 2008. The meeting was intended to address Parent's request for day treatment and Unal's recommendations. Parent cancelled the meeting, but the team met to permit Stein to gather information about K.E., the services she was receiving, and how she was doing in her educational program. Stein asked Johnson to request a copy of Unal's report from Parent before the October 10 meeting. Stein could not recall if any effort was made to get a release for K.E.'s medical information.

Another IEP team meeting was scheduled for October 29, 2008, but the day before, counsel for Parent cancelled it and requested that it be rescheduled. Unal met with K.E. on November 10, 2008, and Parent reported that the District had not implemented Unal's recommendations.

On November 19, 2008, Unal requested a teleconference with Stein and Johnson. The teleconference was scheduled for December 16, 2009, and Unal was to initiate the call. On December 3, 2008, the District received a release signed by Parent permitting it to disclose

information about K.E. to the Mayo Clinic.  After waiting twenty-five minutes for Unal's call on December 16, Stein called Unal's office.  Unal's secretary said that she could not locate Unal and that the teleconference would have to be rescheduled.  Also on December 16, Parent filed a due process complaint and request for administrative hearing with the Minnesota Department of Education (MDE).

The rescheduled teleconference between Unal, Stein, and Johnson took place on December 19, 2008.  Stein testified that Unal described K.E.'s mental health issues and referenced K.E.'s performance in school.  Stein indicated her surprise at Unal's comments regarding K.E.'s school performance, in particular Unal's assertion that K.E. could not read, and invited Unal to participate in K.E.'s IEP team meeting.  Unal accepted Stein's invitation.  Also in December 2008, K.E. was disciplined for hitting another child on the head.

An IEP team meeting to consider Unal's recommendations was scheduled for January 7, 2009.  Parent and counsel for K.E. left the IEP team meeting after a dispute ensued about whether introductions should precede a review of the meeting agenda, or vice versa.  The IEP team continued with the meeting, an audio recording of which was provided to Parent.  The IEP team recommended reevaluating K.E. to address Unal's concerns about processing by conducting a new FBA, a language assessment, and an assistive technology assessment.  The IEP team also developed a proposed IEP for K.E., which included revised goals for K.E., including more specific goals in the areas of writing, social skills, and independent work skills.  The proposed IEP also included the following new adaptations: giving K.E. assistance with organization, giving "open book" exams, permitting her to work with peers as appropriate, providing an EA in her "general education academic classes," permitting her to chew gum during class to assist with focusing, permitting her to draw pictures to demonstrate comprehension,

providing scheduled sensory breaks, providing a disk and sensory ball for sitting, and providing a Franklin Speller, lists of frequently misspelled and misused words, and a work process to use for writing. Fifteen minutes per week with the School social worker were added to the thirty minutes already provided. The proposed IEP and notice of reevaluation was sent to Parent on January 20, 2009. Parent did not consent to the reevaluation or proposed IEP.

On January 14, 2009, Parent sent Unal an e-mail asking her to summarize in writing her conversation with Stein and Johnson. The e-mail indicated that Unal reported to Parent that the District did not know or did not understand the extent of K.E.'s mental illness. The e-mail further indicated that Parent believed the District was lying to Unal because Parent had provided them with medical evaluations describing K.E.'s symptoms.

When Unal saw K.E. on January 19, 2009, she determined that K.E.'s symptoms were worsening and faxed a note to the District asking it to excuse K.E. from attending until January 26, 2009. At the request of Parent, K.E.'s fifth-grade teacher, Holly Bergstrom, prepared take-home work for K.E. At some point in January 2009, K.E. was disciplined for making comments about another child on the school bus, and at the end of January 2009, the District began providing an EA to K.E. in the regular classroom.

Stein received a letter from Unal dated January 28, 2009. The letter indicated that K.E. had experienced a recurrence of her bipolar disorder and was suffering from "pronounced racing of thoughts, deficits in sustaining attention, and attentional set-shifting," which affected her "working memory, goal directed behavior, emotional self-control, organization, and planning functions." Unal recommended a reduction in school hours and home-bound instruction for two months, with a reevaluation to follow thereafter. Unal invited Stein to contact her with any questions.

Stein responded to Unal's January 28 letter on February 2, 2009, the same day Stein received it. She stated that the educational staff had not observed any decline in K.E.'s performance and asked for the basis for Unal's contention that K.E.'s illness was adversely affecting her academic performance. She explained that, because a shortened school day would affect K.E's academic progress, the District could not implement Unal's recommendations without an IEP team meeting. Stein invited Unal to attend the meeting and stated that the District would compensate Unal for her time. Stein asked that, if Unal could not attend the meeting, she explain the basis for her determination that K.E.'s performance was being adversely affected by her mental illness and whether her recommendations would change if K.E.'s teachers reported that they were not observing increased symptoms or problems. Stein also unsuccessfully attempted to contact Unal by telephone.

Also on February 2, 2009, Parent called the School and requested a shortened school day and transportation for K.E. Stein said she would schedule an IEP team meeting to address the request as soon as possible, and originally scheduled the meeting for February 5, 2008. The meeting was rescheduled for February 6, 2009, because Parent and counsel for K.E. were unable to attend on February 5.[14] Parent and counsel for K.E. did not attend the February 6 meeting. Stein attempted to contact Unal twice before the meeting and spoke to a member of Unal's clerical staff during the meeting, who indicated that Unal was available but declined to participate without Parent's express permission.

The IEP team reviewed Unal's January 28 letter and discussed their observations of K.E.'s behavior. Bergstrom noted that K.E.'s attention span had decreased since she returned

---

[14]     The notice of the February 6 team meeting was sent via e-mail at 7:18 p.m. on February 4, 2009. Stein testified that she was trying to schedule the IEP meeting "as soon as possible that week" due to the urgency of Parent's request for a shortened school day.

from winter break, but that K.E. seemed calmer after taking the week off and returning for a shortened school day. The other staff had not noticed any significant changes in K.E.'s behavior. The District provided to counsel for K.E. extensive notes taken during the IEP team meeting, a proposed IEP, and a request for consent for reevaluation (which included components requested by K.E.'s counsel). The IEP team did not incorporate Unal's recommendation for a shorter school day, but did include additional adaptations of providing K.E. access to a five-point scale for evaluating and expressing her emotions and the options of taking a walk, visiting the health office, and using putty, clay, or a scooter. In addition, K.E.'s sensory breaks now included use of an indoor or outdoor swing as alternatives. The School social worker agreed to develop more coping strategies to help the EAs work with K.E. Parent did not consent to the proposed IEP or reevaluation.

In a letter to Stein dated February 11, 2009, Unal responded that she was "very surprised" by Stein's February 2 letter "apparently questioning why these accommodations are needed," and recommended placing K.E. in a day care setting or a school district with more resources and experience dealing with bipolar illness. During the due process hearing, Unal testified that she viewed Stein's February 2 letter as "questioning [her] judgment."

On February 13, 2009, Parent filed an amended due process complaint and request for administrative hearing that added requests for a shortened school day, transportation, and an appropriate therapeutic education. Shortly thereafter, Parent withdrew the release of information permitting the District to communicate with Unal regarding K.E. The withdrawal was prompted by Unal's receipt of a letter dated March 4, 2009, in which Stein explained that the District could not "blindly accept[] another professional's conclusions or programming recommendations," expressed her disappointment that Unal did not answer Stein's questions, and questioned Unal's

willingness to provide additional information in view of Unal's failure to respond to three District phone calls seeking information about Unal's January 28 letter.

## G.      Due process hearing

The administrative hearing on K.E.'s amended due process complaint took place over nine days in April and May 2009. Unal testified extensively about the nature of bipolar disorder and K.E.'s condition. She testified that bipolar disorder is a complex disorder requiring complicated treatment and that it is an episodic or cyclical illness, which means the symptoms occur, vanish, and reoccur. According to Unal, K.E.'s parents sought a second opinion as to K.E.'s condition because she had been seen without success by many psychiatrists, psychologists, and therapists.[15] Unal concluded that K.E. suffered from the "most disabling form of bipolar disorder," which was comorbid with her ADHD. K.E.'s bipolar disorder prevented her from forming a reference point of stability from which she could relate to other children and from organizing her thoughts. It also affected K.E's executive functioning and caused her to be argumentative. In addition, according to Unal, K.E.'s mood episodes could be associated with psychotic symptoms such as delusion and hallucinations.

Unal testified that it is essential for the District to understand the impact that K.E.'s bipolar disorder has on her functioning. Otherwise, the cyclical nature of bipolar disorder could confuse K.E.'s educators because it affected her functioning from day to day. Unal opined that close communication between K.E.'s parents and the School was important, that K.E. should have daily contact with a School counselor knowledgeable in bipolar disorder who would monitor K.E.'s mental health, and that K.E.'s parents should notify the School of K.E.'s sleep patterns, behavioral changes, and emotional changes to permit the School to "fine tune" its

---

[15]      Unal specializes in providing a second opinion in complex cases such as K.E.'s.

demands on K.E.  According to Unal, the severity of K.E.'s episodes would be decreased by reducing the stress on K.E. if her mental health deteriorated.  Unal also recommended providing K.E. with a paraprofessional because K.E. was "really demanding, really needy" and "easily frustrated, shut down."  In addition, a paraprofessional could help with stress reduction by monitoring K.E.'s status and preventing stressful situations.

Unal did not review the evaluations of Miller and Ziegler when forming her opinions about K.E.  According to Dr. William Dikel, a clinical professor in psychiatry at the University of Minnesota with extensive experience in the diagnosis and treatment of children with mental illness, the standard of care would require a psychiatrist to review a child's prior medical evaluations, review the child's educational records, and confer with the child's educators before deciding on an appropriate treatment plan.  Dikel agreed that K.E. presented an "extremely complex" and "extremely difficult" case.  He testified that K.E.'s case was "rather unusual" and observed that, by the time she was eight years old, K.E. had spent the past six years on "over 20 psychiatric medications from every class of psychiatric medications, antipsychotics, antidepressants, stimulants, Valium type of medications, mood stabilizers, miscellaneous medications and homeopathic and other nutritional treatments."

**H.      Post-hearing**

In an order dated August 6, 2009, the ALJ concluded that the District had failed to comply with certain procedural requirements of the IDEA and that the District's failure to conduct appropriate evaluations, include the results of the evaluations that it did conduct in K.E.'s IEPs, and develop and revise appropriate IEPs and an appropriate BIP for K.E. denied her FAPE from December 16, 2006, to February 13, 2009.  The ALJ also found that the District's

denial of K.E.'s request for placement in a day treatment center and a shortened school day did not deny FAPE to K.E.

On August 27, 2009, K.E. sought assistance from the MDE because "nothing ha[d] been accomplished to ensure compliance" with the ALJ's order. K.E.'s IEP team had not yet met to ensure that K.E. had a new IEP at the beginning of sixth grade. The District responded that it had begun implementing the ALJ's order but many of the consultants and specialists the District worked with were unavailable because the summer vacation had not ended. On September 15, 2009, the MDE found that the District violated 34 C.F.R. § 300.323 (2006) by not developing an appropriate IEP for K.E. at the beginning of the school year. The MDE ordered the District to convene an IEP team meeting within five days.

On September 9, 2009, K.E. filed an action in federal district court seeking attorney fees and costs. The District filed its Answer and Counterclaim October 1, 2009. The District filed a motion for judgment on the administrative record challenging several findings of fact and conclusions of law in the ALJ's order. K.E. filed a cross-motion for judgment on the administrative record seeking affirmance of the ALJ's order and also filed a motion for attorney fees and costs.[16]

## II.    DISCUSSION

### A.    Judgment on the administrative record

"One purpose of the IDEA is 'to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related

---

[16]    In its memorandum in support of its motion for judgment on the administrative record, the District contends that it is entitled to default judgment under Rule 55 of the Federal Rules of Civil Procedure because K.E. never answered the District's Counterclaim. "[E]ntry of default under Rule 55(a) must precede a grant of default judgment under Rule 55(b)." *Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 783 (8th Cir. 1998). Because the District has not sought entry of default under Rule 55(a), it is not entitled to default judgment on its Counterclaim.

services designed to meet their unique needs.'" *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1026 (8th Cir. 2003) (quoting 20 U.S.C. § 1400(d)(1)(A)). States that accept federal funding under the IDEA must provide disabled students with FAPE. *Id.* A team must develop a specialized course of instruction, or IEP, for each disabled student, taking into consideration that child's capabilities. *Id.*

A parent who is dissatisfied with the substance or implementation of her child's IEP may request a state administrative due process hearing before an independent hearing officer. 20 U.S.C. § 1415(f)(1)(A); Minn. Stat. § 125A.091, subd. 12 (2008). In Minnesota, a party may appeal the hearing officer's decision to either federal district court or the state court of appeals. Minn. Stat. § 125A.091, subd. 24; *see also* 20 U.S.C. § 1415(i)(2)(A).

When deciding a lawsuit brought by a party aggrieved by the result of the due process hearing, a court first inquires whether the state has complied with the procedures set forth in the IDEA and then determines if the IEP is "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982). If these requirements are met, the state has complied with the obligations imposed by Congress, and a court can require no more. *Id.* at 207. In light of the limited resources Congress provides to the states to implement the policies underlying the IDEA, a school district is not required to "maximize a student's potential or provide the best possible education at public expense." *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 612 (8th Cir. 1997). Rather, the requirements of the IDEA are met "when a school district provides individualized education and services sufficient to provide disabled children with 'some educational benefit.'" *Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 658 (8th Cir. 1999) (quoting *Rowley*, 458 U.S. at 200).

"Because judges are not trained educators, judicial review under the IDEA is limited."

*E.S. v. Indep. Sch. Dist., No. 196*, 135 F.3d 566, 569 (8th Cir. 1998). When reviewing a school district's compliance with the IDEA after an administrative hearing, a court should make an independent decision, based on a preponderance of the evidence and giving "due weight" to the administrative proceedings, whether the IDEA was violated. *Neosho*, 315 F.3d at 1027-28. "The district court must give 'due weight' because the [ALJ] had an opportunity to observe the demeanor of the witnesses and because the court should not substitute its own educational policy for those of the school authorities that they review." *Strawn v. Mo. State Bd. of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000). On appeal to a federal district court, the party who challenges the outcome of the ALJ's decision has the burden of proof. *Blackmon*, 198 F.3d at 658.

### 1.      Procedural errors at the administrative level

The District argues that the administrative hearing was procedurally flawed because the ALJ failed to clarify the issues before the hearing. On December 30, 2008, fourteen days after K.E. filed her due process complaint, the District notified in writing K.E. and the ALJ of its objections to the sufficiency of the due process complaint in the manner set forth in 20 U.S.C. § 1415(c)(2)(A). On February 13, 2009, K.E. filed an amended due process complaint and request for administrative hearing. The District did not notify in writing K.E. or the ALJ of any objections to the sufficiency of the amended due process complaint, and nothing in the record indicates that the District objected to its sufficiency at the pre-hearing conferences or the hearing. In the absence of any such objection, the District has waived its objections to the sufficiency of the amended due process complaint. *See Moubry v. Indep. Sch. Dist. No. 696*, 9 F. Supp. 2d 1086, 1100 (D. Minn. 1998) ("[T]he failure to raise, and to preserve, an issue in the administrative process—absent a demonstration that circumstances warrant a relaxation of the

exhaustion requirement . . . constitutes a waiver of such an issue in a subsequent civil action."). The ALJ did not err in failing to clarify the issues stated in the amended due process complaint before the hearing.

The District also contends that it was prejudiced by the ALJ's restatement of the issues after the hearing. Under Minnesota law, the ALJ is to "identify the questions that must be answered to resolve the dispute and eliminate claims and complaints that are without merit" at a prehearing conference. Minn. Stat. § 125A.091, subd. 15(1). In an order dated March 2, 2009, the ALJ stated "[t]he issues to be addressed at [the] hearing are set forth in [the] Amended Complaint and Request for Hearing, IDEA Claims, paragraphs 43-64." The District contends, however, that the ALJ restated the issues after the hearing in a letter dated June 2, 2009, and again in the ALJ's order. Such restatement of the issues may be acceptable if it does not change the ALJ's consideration of the arguments. *See J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 611 F. Supp. 2d 1097, 1111 (E.D. Cal. 2009). Here, the District identifies two issues whose restatement altered the ALJ's consideration of the arguments.

First, K.E. asserted in paragraph 44 of the amended due process complaint that the District "did not timely evaluate or identify [K.E.] as a student with a disability as required by 20 U.S.C. § 1414(b)(1-3); 1412(a)(6)(B); 34 C.F.R. §§ 300.300 and 300.301." The cited statutory and regulatory sections relate to the manner of conducting evaluations and the requirement of parental consent. In the order, however, the ALJ restated this issue as: "Did the School District conduct a full, individual evaluation of [K.E.] at least once every three years, and more often as warranted?" The "three years" requirement relates to reevaluation and is set forth in 20 U.S.C. § 1414(a)(2)(A)-(B) and 34 C.F.R. § 300.303, neither of which are referenced in K.E.'s amended due process complaint. The ALJ then found that the District should have reevaluated K.E. in

March 2007 and failed to reevaluate her in all areas of suspected disability at that time. Although K.E. maintains that there is no substantive difference between paragraph 44 and the ALJ's restatement of the issue, the ALJ's restatement of a claim for failure to timely identify or evaluate K.E. to a claim for failure to timely *reevaluate* K.E. clearly altered the ALJ's consideration of the District's arguments, and was erroneous.

Second, K.E. asserted in paragraph 46 of the amended due process complaint that the District "did not adequately consider input from [K.E.]'s Parents in planning and programming as required by the IDEA, 20 U.S.C. § 1414(b)(2) . . . [t]he District has disregarded specific recommendations made by [K.E.]'s primary treating psychiatrist, Dr Sencan S. Unal from the Mayo Clinic." The ALJ restated this issue as "[i]n conducting its evaluations, did the School District fully consider the information provided by [Parent]," and found that the District did not "fully consider [Miller's and Ziegler's evaluations] in its decisions concerning [K.E.]'s educational programming." The District contends that the ALJ's consideration of the arguments was altered by the broadening of this issue and that lack of notice of the broader issue deprived it of the opportunity to present evidence "more directly establish[ing]" how it responded to the information provided by Parent. The Court agrees. The expansion of the information allegedly not considered by the District from Unal's recommendations to all information provided by Parent altered the ALJ's consideration of the arguments. The ALJ erred in the restatement of paragraph 46.[17]

K.E. does not identify any allegations in her amended due process complaint that correspond to the restated issues. Instead, citing Minnesota Statutes § 129A.091, subd. 18, she

_____

[17]     The Court recognizes that the ALJ was faced with a formidable task in parsing K.E.'s claims. As noted by the ALJ, K.E.'s statement of issues was "duplicative, confusing, and contain[ed] some inaccurate citations to the law."

asserts that an ALJ has "significant authority" to inquire into a school district's compliance with federal and state statutes. While this statutory subsection gives an ALJ authority to "establish and maintain control and manage the hearing" by "making decisions involving identification, evaluation . . . or the provision of [FAPE] to a child with a disability," *see* Minn. Stat. 125A.091, subd. 18(b)(5), nothing in the statute gives an ALJ the authority to decide issues not raised by the parties.

K.E. also contends that the restatement of issues was warranted because it was not apparent until the due process hearing that Miller's and Ziegler's evaluations were kept in K.E.'s medical file rather than in her special education file, and that the District's witnesses questioned K.E.'s diagnosis of bipolar disorder because they did not have a formal medical diagnosis on file. Since neither Miller nor Ziegler actually diagnosed K.E. with bipolar disorder, the storage location of their evaluations is irrelevant to whether the District required a formal diagnosis. Moreover, the reference to K.E.'s diagnoses of bipolar disorder in the District's evaluations indicates that, while the District may not have appreciated the full impact of K.E.'s bipolar disorder on her education, it did not ignore the diagnosis.

Because the ALJ's restatement of paragraphs 44 and 46 affected the ALJ's consideration of the parties' arguments by raising claims not alleged by K.E., the Court reverses the ALJ's order insofar as it concluded that the District should have performed a reevaluation in spring 2007 and failed to conduct that reevaluation in all areas of suspected disability. The Court also reverses the ALJ's order insofar as it concluded that the District failed to consider Miller's and Ziegler's evaluations when reevaluating K.E.

The District next maintains that the ALJ misapplied the burden of proof when making certain findings of fact. The District first challenges the ALJ's findings that the District never

asked Parent to confirm K.E.'s diagnosis of bipolar disorder and made no effort to contact

Miller, obtain a medical release, correlate K.E.'s performance with a possible mood disorder, or

determine the reason for K.E.'s hospitalization in 2005. K.E. responds that "the absence of

evidence that is used by the ALJ is an absence of evidence for which the Defendant was

responsible." This argument misses the mark because, regardless of who was "responsible" for

the evidence, the burden of proof was on K.E. at the due process hearing. *See West Platte R-II*

*Sch. Dist. v. Wilson,* 439 F.3d 782, 784 (8th Cir. 2006). Moreover, all of the evidence was not in

the District's control. K.E. could have offered testimony from Parent that the District never

asked her to confirm K.E.'s diagnosis of bipolar disorder or asked why K.E. was hospitalized in

2005. Although K.E. maintains she sustained her burden of proof by "demonstrating a

negative," she cites no evidence supporting the findings made by the ALJ on those topics.

Consequently, the ALJ erred in making the findings described above.[18]

The District also contends that the ALJ misapplied the burden of proof when finding that

the District failed to provide K.E. with an EA in her art, music, PE, and computer classes (special

classes). The District, however, conceded in its post-hearing brief that "the evidence and

testimony presented at [the] hearing indicated that the Student was not provided with a

paraprofessional in her regular education classrooms for a portion of her fourth and fifth grade

school years." Moreover, the fourth and fifth grade IEPs provided for EA access within the

classroom and resource room and at lunch and recess, but made no reference to EA support in

---

[18]     The District contends that the ALJ's conclusion that it failed to provide K.E. with
necessary psychological and social work services must be reversed as based on those erroneous
findings of fact. The ALJ's conclusion, however, was based on additional findings, including the
District staff's failure to recognize the episodic nature of bipolar disorder and include mental
health monitoring in K.E.'s IEP. The Court addresses this conclusion below.

special classes.[19]  In light of the District's concession in its post-hearing brief and the limitation

of EA support in the IEPs, the ALJ did not misapply the burden of proof when finding that the

District failed to provide an EA to K.E. in her special classes.

### 2.     Effect of the diagnosis of bipolar disorder and Unal's recommendations

The ALJ's conclusion that the District denied FAPE to K.E. was based in part on the

District's failure to investigate K.E.'s diagnosis of bipolar disorder and to "respond[] more

promptly to the concerns that Unal raised."  The Court first addresses the District's failure to

investigate the bipolar disorder diagnosis.  The record indicates that, until it received Unal's

diagnosis, the District received contradictory information about whether K.E. had bipolar

disorder.  For example, Miller's evaluation stated that one psychiatrist had diagnosed K.E. with

bipolar disorder, but that K.E.'s then-current psychiatrist was in the process of ruling out bipolar

disorder.  Miller did not diagnose K.E. with bipolar disorder.  As for Ziegler's evaluation, while

he referenced a previous diagnosis of bipolar disorder by a Connecticut doctor, his results

indicated that K.E. did not exhibit symptoms consistent with a diagnosis of bipolar disorder.

Significantly, the 2005 diagnosis that confirmed K.E.'s eligibility for IDEA services was not for

bipolar disorder.  While the School received an order for the administration of Risperdal for

bipolar disorder during third grade, the School received notice at the beginning of fourth grade

that K.E. was not taking any prescription medications.

In addition, Miller, Ziegler, and the medical providers referenced in Miller's and

Ziegler's evaluations disagreed as to whether K.E. suffered from bipolar disorder, as well as

several other potentially-disabling conditions.  Unal testified that K.E. had presented partial

remissions and relapses since the age of six and had been seen by mental health professionals

---

[19]     The District's documents, including the 2008 evaluation, distinguish between the art, music, computer, PE, classroom, and resource settings.

while actively symptomatic and in partial remission. According to Unal, K.E. would not have met the threshold for a diagnosis of bipolar disorder when partially symptomatic, and there is no evidence that any investigation by the District would have resulted in a formal diagnosis of bipolar disorder. Given these circumstances, it is unclear what, if anything, the District could or should have done differently if it had investigated whether K.E. had bipolar disorder prior to receiving Unal's diagnosis.

Further, the relevant question is whether the IEP team considered K.E.'s unique needs when developing her programming, not how her disability was identified. *See Pachl ex rel. Pachl v. Seagren*, 373 F. Supp. 2d 969, 975 (D. Minn. 2005) (explaining IEP team required to consider student's unique needs, not specific diagnosis). Members of the IEP team testified that the team considered, took into account, and accommodated the reported mood and bipolar disorders when developing K.E.'s IEPs. This testimony is supported by the references to K.E.'s "mood disorder" and to Parent's reporting of bipolar disorder in the 2005 and 2008 evaluations. No evidence indicates that the District failed to consider the potential mood and bipolar disorders when developing K.E.'s IEP. For these reasons, the ALJ erred to the extent that the conclusion that K.E. was denied FAPE was based on the District's failure to formally recognize her bipolar disorder.

To the extent the ALJ based the conclusion of a denial of FAPE on the District's failure to incorporate Unal's recommendations into K.E.'s IEP and BIP, that finding also was erroneous. The ALJ stressed that "no conversation of substance" took place between Unal's first contact with the District in September 2008 and December 2008, and focused on the District's failure to obtain a release permitting it to provide information about K.E. to Unal. This analysis ignores the parents' reciprocal obligation to "operate within the [IDEA's] procedural framework."

*Cordrey v. Euckert*, 917 F.2d 1460, 1466 (6th Cir. 1990); *see also CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 640 (8th Cir. 2003) (declining to find denial of FAPE for failure to develop BIP where school proposed a BIP but parent disagreed and withdrew child from district).  The record indicates that the District's failure to incorporate Unal's recommendations resulted not from the failure to obtain a medical release, but from Parent's refusal to participate in the IEP process and Unal's lack of response to the District's phone calls and letters.  The District scheduled four IEP team meetings to address Unal's recommendations between September 26, 2008, and February 13, 2009.  The IEP team meetings for October 10 and 29 were postponed by Parent or counsel for K.E.  Parent and counsel for K.E. left the January 7 meeting over a dispute about the meeting agenda, and did not attend the February 6 meeting despite the urgency of Unal's request for shortened school days.  Parent then rejected the revised IEPs and reevaluations proposed after the January 7 and February 6 meetings.

As for Unal, Stein immediately returned her September 26 phone call, but Unal did not call her back.  Even after the District obtained the medical release, Unal did not attend the previously-scheduled teleconference with Stein and refused to answer the District's requests for the basis for her conclusions.  Stein called Unal in advance of the February 6 meeting, but Unal declined to participate without Parent's express permission.  In short, the District made repeated efforts to incorporate Unal's recommendations into K.E.'s IEPs, but was prevented from doing so by Unal's unavailability, the rescheduling of IEP team meetings by Parent and counsel for K.E., and the lack of participation of Parent and counsel for K.E. in the IEP process after filing the due process complaint.  Consequently, the District's failure to incorporate Unal's recommendations into K.E.'s IEP does not support the ALJ's finding of a denial of FAPE.

### 3. Procedural violations of the IDEA

#### a. *Failure to consider evaluations of Miller and Ziegler and its own evaluations*

The District challenges the ALJ's conclusion that the District did not consider Miller's and Ziegler's evaluations when developing K.E.'s IEPs because "several important recommendations were not included in [K.E.]'s programming." The IDEA requires IEP teams to "consider" evaluations of the child when developing the IEP. 20 U.S.C. § 1414(d)(3)(A)(iii). The incorporation of many of Miller's and Ziegler's recommendations into the IEPs indicates that the team considered the evaluations. *See G.D. v. Westmoreland Sch. Dist.*, 930 F.2d 942, 947 (1st Cir. 1991) (consideration does not require substantive discussion; review at IEP meeting and partial incorporation sufficient). For example, Miller recommended reduced workloads and increased time for work completion, both of which were incorporated into K.E.'s IEPs. Miller also recommended giving K.E. "an opportunity to withdraw briefly" when she became frustrated, and the IEPs incorporated sensory breaks for K.E. Miller's recommendation of multi-modal presentation of information was included as an adaptation into the IEPs. Miller recommended "cue assistance" for K.E., which the IEPs incorporated as a "visual checklist" for task completion.

Similarly, Ziegler recommended providing paraprofessional support to K.E.; the IEP increased access to an EA. Ziegler recommended the IEP team reconvene and "consider" additional services in the area of written language, which the IEP did. While the IEP team did not add speech and language services to K.E.'s IEP after receiving Ziegler's evaluation, the IEP team was required only to "consider," not to "incorporate," the evaluation's recommendation. *See Evans v. Dist. No. 17*, 841 F.2d 824, 830 (8th Cir. 1988) (finding school district "considered" outside evaluation when it agreed that evaluation was accurate but disagreed with its conclusion

that the only appropriate placement was private). Moreover, Baciak testified that speech and language services were not added because the team determined that K.E. was not demonstrating a need for them at that time. Baciak also testified that the IEP team considered all of Ziegler's recommendations at the March 2007 meeting and added increased access to an EA "because it was one of the recommendations in the outside evaluation." The Court therefore finds that the ALJ's conclusion that the District did not adequately consider the evaluations of Miller and Ziegler is erroneous.

The District also challenges the ALJ's conclusion that it failed to consider its own evaluations. The ALJ concluded that the District did not consider the 2005 and 2008 evaluations because many of the adaptations mentioned in the evaluations were not included in the IEPs. While the IEPs did not incorporate every adaptation or address every problem identified in the District's evaluations, they did incorporate several adaptations intended to address identified issues. For example, according to the 2005 evaluation, K.E.'s small group reading teacher provided adaptations including preferential seating, assistance with organization, and additional time for completion of assignments and tests. All of those adaptations were included in K.E.'s IEPs. The 2005 evaluation stated that K.E. had difficulty with organization and with her peers; the IEPs included goals directed to these identified issues. Similarly, the May 2008 IEP addressed the sensory processing issues identified in the 2008 reevaluation by providing K.E. with access to sensory tools, sought to address K.E.'s behavioral issues by incorporating a BIP, and sought to address K.E.'s social interaction problems by providing K.E. with an EA at lunch and recess. Based on these facts, the Court concludes that the District did "consider" the results of its own evaluations when developing IEPs for K.E., and the ALJ's conclusion to the contrary is erroneous.

### b.    Development and implementation of IEPs

The District challenges several of the ALJ's findings and conclusions relating to the development and implementation of K.E.'s IEPs.  First, the ALJ concluded that the District failed to provide necessary psychological and social work services by failing to monitor K.E.'s sleep patterns, behaviors observed by Parent, changes in medication, external stressors, and response to educational programming.  An IEP must include "a statement of the special education and related services . . . to be provided to the child . . . to advance appropriately toward attaining the annual goals" and "to be involved in and make progress in the general education curriculum."  20 U.S.C. § 1414(d)(1)(A)(i)(IV).  Psychological services and social work services are included in such related services "as may be required to assist a child with a disability to benefit from special education."  *Id.* § 1401(a)(26)(A).

The ALJ concluded that the IEP should have provided for psychological and social work services to monitor K.E.'s mental health and address issues at home that could affect K.E.'s educational performance based on the cyclical nature of bipolar disorder and Parent's reports that K.E. had difficulty sleeping.  While such services may appear appropriate in light of Unal's testimony, an IEP cannot "be judged exclusively in hindsight," but rather "must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated."  *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990); *see also CJN*, 323 F.3d at 638 ("When a disabled student has failed to achieve some major goals, it is difficult to look back at the many roads not taken and ascertain exactly how reasonable his IEPs were at the time of their adoption.").  At the time K.E.'s IEPs were developed, the District did not have a confirmed diagnosis of bipolar disorder, much less the benefit of Unal's testimony about the extreme severity and complexity of K.E.'s condition or the

need to "fine tune" her academic demands in response to her current status. Consequently, the ALJ erred in finding the District failed to provide necessary psychological and social work services before February 12, 2009.

The District also challenges the ALJ's conclusion that the IEPs did not reflect the manner in which K.E.'s disability affected her academic achievement and functional performance. An IEP must include a statement of "how the child's disability affects the child's involvement and progress in the general education curriculum." 20 U.S.C. § 1414(d)(1)(A)(i)(I)(aa). K.E.'s IEPs stated that she had difficulty with attention, organization, retention of skills, following directions, social interactions, and impulsivity. They specifically noted that she performed better in a setting with limited distractions and when she received direct instruction. The May 2008 IEP noted that K.E. struggled with organizing her sentences and paragraphs and determining which steps to follow when solving math story problems. The IEPs included adaptations intended to address those issues, including repeating directions, giving directions one-on-one, sensory tools, and placement in a resource setting.

With respect to K.E.'s behavioral issues, the BIP incorporated into her May 2008 IEP identified verbal disruptions and negative interactions with peers as issues for K.E., described the triggers of those behaviors, and identified the desire for attention and clarification of academic instruction as possible reasons for those behaviors.[20] In short, although the IEPs did not detail

---

[20]    K.E. asserts that the District's failure to develop an effective BIP was a substantive violation of the IDEA. The IDEA does not impose "any specific substantive requirements" for a BIP. *Alex R. ex rel. Beth R. v. Forrestville Valley Community Unit Sch. Dist.*, 375 F.3d 603, 615 (7th Cir. 2004). The IDEA requires an IEP team to, "in the case of a child whose behavior impedes the child's learning and that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). Accordingly, rather than focusing on the BIP in isolation, the Court considers whether the BIP and the IEP addressed the components of K.E.'s behavior that impeded her learning and that of others.

every manner in which K.E.'s disability affected each of her goals, the IEPs and BIP recognized its impact on her ability to learn and provided strategies to address it. For these reasons, the ALJ's conclusion that K.E.'s IEPs did not reflect how her disability affected her academic achievement and functional performance was in error.

The District challenges the ALJ's conclusions that the IEPs did not include a statement of annual goals intended to meet K.E.'s needs to permit her to make progress in the general curriculum and that the District failed to revise the IEPs as necessary to permit K.E. to make such progress. An IEP must include statements of "measurable annual goals, including academic and functional goals, designed to . . . meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum" and of "the child's other educational needs that result from the child's disability." *Id.* § 1414(d)(1)(A)(i)(II). In addition, the IEP team must revise the IEP to address "any lack of expected progress toward the annual goals and in the general education curriculum," "the results of any reevaluation," and information about the child provided by the parents. *Id.* § 1414(d)(4)(A)(ii).

The ALJ's conclusions that the IEPs did not include a statement of annual goals intended to meet K.E.'s needs to permit her to make progress and that the District did not revise K.E.'s IEPs as necessary to permit progress were based on K.E.'s lack of progress with respect to writing, social skills, and independent work skills.[21] In so concluding, the ALJ disregarded the

---

[21] To the extent the ALJ based this conclusion on the District's failure to investigate the diagnosis of bipolar disorder and failure to incorporate Unal's recommendations into K.E.'s IEPs, this conclusion was erroneous for the reasons previously stated.

undisputed evidence of K.E.'s progress in reading, spelling, and math.[22]  K.E.'s progress in those

areas suggests that her IEPs did contain a statement of goals intended to meet her needs.  *See*

*CJN*, 323 F.3d at 642 ("Where, as here, the record indicates that a student's behavioral problems,

if unattended, might significantly curtail [her] ability to learn, the fact that [she] is learning is

significant evidence that [her] behavioral problems have, at least in part, been attended to.").

Although K.E. failed to meet her social skills and independent work skills goals in 2007 and

2008, the District sought to address those deficiencies by incorporating the BIP and behavior log

into the May 2008 IEP.  The BIP included strategies intended to decrease the potential for

behavioral issues, including checking to see if K.E. understood instructions and preferential

seating and line placement.  In addition, the May 2008 IEP contained several new adaptations for

K.E., including the provision of sensory tools, which the June 2008 progress report indicated

helped increase her focus and attention span.

    K.E. argues that the IEPs did not incorporate every adaptation mentioned by K.E.'s

teachers in the May 2008 evaluation.  K.E. cites no authority for the proposition that an IEP must

list every adaptation that could benefit a student, and the IDEA "does not require that a school

either maximize a student's potential or provide the best possible education at public expense."

*Fort Zumwalt*, 119 F.3d at 612.  Because K.E.'s IEPs resulted in academic progress and were

revised to address her behavioral issues, the ALJ's conclusions that the IEPs did not include a

statement of annual goals intended to meet K.E.'s needs to permit her to make progress and were

not revised to account for lack of expected progress were erroneous.

    The ALJ also concluded that the District's failure to provide K.E. with an EA in the

classroom and resource room as required by the 2007 and 2008 IEPs deprived K.E. of

_____

[22]     K.E. alleged in her amended due process complaint that she was making progress in the
areas of spelling, reading, and math between 2006 and 2008.

educational benefit. The definition of FAPE requires the provision of special education and related services "in conformity with the [student's IEP]." 20 U.S.C. § 1401(9)(D). To succeed on a challenge to the implementation of an IEP, K.E. must show that the District failed to implement a significant provision of the IEP. *See Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d 576, 587 (5th Cir. 2009). Whether a provision is significant is determined in part based on whether the services provided actually conferred an educational benefit. *Id.* For the reasons stated with respect to the alleged substantive violation of the IDEA, the record indicates that K.E. progressed academically despite the District's failure to provide her with consistent EA services. Consequently, the District's failure to provide an EA to K.E. did not deprive her of educational benefit.

### 4. Substantive violation of the IDEA

In addition to challenging the ALJ's finding as to procedural violations, the District also challenges the ALJ's conclusion that K.E. was denied FAPE. The District argues that K.E. received FAPE because she received passing marks, advanced in grade level, and made progress in reading, math, and spelling. K.E. responds that she was denied FAPE because she did not meet her goals in the areas of reading, writing, and organization, the record contained no evidence of progress, and there was no evidence that the gap between K.E. and her same-age peers was closing.

An IEP accords FAPE when it offers individualized education and services sufficient to provide the disabled child with some educational benefit. *See Neosho*, 315 F.3d at 1027. "[A]cademic progress is an 'important factor' among others in ascertaining whether the student's IEP was reasonably calculated to provide educational benefit." *CJN*, 323 F.3d at 642 (quoting *Rowley*, 458 U.S. at 202). K.E.'s progress reports indicate that, between November 2006 and

May 2008, she progressed from decoding consonant-vowel-consonant words to decoding words having between five and six letters and containing digraphs and blends. K.E. advanced from reading at a second-grade level at 34 words per minute with 91% accuracy to reading at a third-grade level at 105 words per minute with 100% accuracy and reading at a fourth-grade level at 54 words per minute with 90% accuracy. Her ability to spell words on her weekly spelling lists and on spelling review tests improved from spelling consonant-vowel-consonant words to more advanced words. She progressed from telling time to the half-hour, naming and counting coins, and one-digit addition and subtraction to telling time to the minute, three-digit addition and subtraction, and skip counting by 2, 5, and 10. In summary, K.E.'s progress reports demonstrate meaningful academic progress in the areas of reading, spelling, and math. The lack of progress on K.E.'s writing goal does not vitiate her progress with respect to her other academic goals. *See id.* ("[T]he IDEA does not . . . guarantee that the student actually make any progress at all.").

In addition, K.E.'s standardized test results showed growth in math, reading, and language usage. Although the results did not show as much growth as was typical for her grade level, an IEP need not be designed to maximize a student's potential commensurate with the opportunity provided to other children. *M.M. ex rel. L.R. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 461 (8th Cir. 2008). "Rather, 'the requirements of the IDEA are satisfied when a school district provides individualized education and services sufficient to provide disabled children with some educational benefit.'" *Id.* (quoting *Neosho*, 315 F.3d at 1027). Here, the evidence indicates that K.E.'s IEPs provided her with some educational benefit.

K.E. contends that her lack of progress with respect to her behavioral, social, and independent work skills demonstrate that the District denied her FAPE. "When a child's primary disability is a behavioral disorder, the school district does not violate IDEA simply because the

child failed to achieve the IEP's behavioral goals." *Id.* K.E.'s current diagnosis includes ADHD, bipolar disorder, and oppositional defiant disorder. Unal described K.E.'s bipolar disorder as the "most disabling form," and Dikel described K.E.'s mental condition as extremely complex and difficult to treat. Between fall 2006 and February 2009, K.E.'s medication regimen alternated between anti-psychotic and attention-modifying prescription medications and "natural" and herbal medications. Despite the severity of her mental illness and the changes in her medical treatment, K.E. made progress with respect to reading, spelling, and math, received passing grades in her classes, advanced from grade to grade, and demonstrated growth on standardized tests between December 2006 and February 2009. For these reasons, the ALJ's conclusion that K.E. was denied FAPE because her IEPs were not reasonably calculated to provide some educational benefit was erroneous. The District did not deny FAPE to K.E. between December 16, 2006, and February 13, 2009. The Court therefore grants the District's motion for judgment on the administrative record and denies K.E.'s motion for judgment on the administrative record.

## B.     Attorney fees and costs

K.E. seeks an award of attorney fees and costs. The IDEA permits a court, in its discretion, to award reasonable attorney fees as part of the costs to "a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i). A litigant is a "prevailing party" if she obtains actual relief on the merits of the claim that materially altered the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff. *Drennan v. Pulaski County Special Sch. Dist.*, 458 F.3d 755, 756-57 (8th

Cir. 2006). Because the District did not violate the IDEA, K.E. is not a prevailing party, and the

Court denies her motion for attorney fees and costs.[23]

### III.  CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.  K.E.'s motion for judgment on the administrative record [Docket No. 9] is DENIED.

2.  K.E.'s motion for attorney fees and costs [Docket No. 9] is DENIED.

3.  The District's motion for judgment on the administrative record [Docket No. 19] is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  May 24, 2010

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

---

[23]  Had K.E. prevailed on her IDEA claims, the Court would have substantially reduced any award of attorney fees for two reasons. First, K.E. would not have been entitled to attorney fees for costs incurred between April 1, 2009, and April 24, 2009, because counsel for K.E. was not licensed to practice law in the State of Minnesota during that time. *See* Minn. Stat. § 481.02 (2008); *see also Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 374 F.3d 857, 860-62 (9th Cir. 2004) (denying attorney fees under the IDEA for services performed during state administrative hearing by attorney not admitted in the state). Second, a reduction would have been warranted because Parent and counsel for K.E. "unreasonably protracted the final resolution of the controversy." 20 U.S.C. § 1415(i)(3)(F)(i). Parent and counsel for K.E. cancelled or refused to attend four IEP meetings between October 2008 and February 2009, thereby delaying the implementation of a new IEP for K.E. for several months after the District first became aware of Parent's concerns and Unal's recommendations in September 2008. In addition, counsel for K.E. stated on the record at the February 27, 2009, pre-hearing conference that she would "bank her annual salary" that the resolution session required by 20 U.S.C. § 1415(f)(1)(B) would be unsuccessful, and—based on the uncontradicted affidavit of counsel for the District— demonstrated her belief in its futility by using profanity throughout the session and placing her feet on the table and whistling during Stein's opening comments. The conduct of Parent and counsel for K.E. "frustrated the operation of a collaborative process and put the School District in an untenable position," *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 30 (1st Cir. 2008), and consequently would require a reduction in any award of attorney fees.